WORTHEN, Clerk, etc., vs. ROOTS et al.

1. COUNTY COURT: *Power to make allowances and issue warrants beyond appropriations.*

Since the passage of the act of March 18, 1879, the county court is not prohibited from allowing claims against the county, in excess of the appropriations. The law makes it the duty of the clerk to issue warrants on allowances when made. (ENGLISH, C. J., dissenting as to so much of the opinion as holds that the clerk may issue warrants upon allowances not covered by appropriations, or against exhausted appropriations.)

APPEAL from *Pulaski* Chancery Court.
Hon. D. W. CARROLL, Chancellor.
*Hughes*, for appellant.
*Rose*, contra.

EAKIN, J. At the October term, 1879, of the Pulaski
county court, in full session with the justices, a tax of
five mills on the dollar, for general purposes, was levied
upon the assessed value of real and personal property in
the county; estimated at $6,573,650, and the proceeds from
said tax were appropriated as follows:

| | |
|---|---:|
| For expenses of the circuit court..................... | $7,000 00 |
| For expenses of the county court.................. | 6,800 00 |
| For expenses of prisoners in jail..................... | 7,000 00 |
| For making tax and assessment books............ | 1,750 00 |
| For paying for public records........................ | 300 00 |
| For support of paupers................................. | 1,000 00 |
| For building bridges and repairing roads.......... | 1,250 00 |
| For expenses of justices' courts...................... | 3,000 00 |
| For county expenses allowed by law............... | 1,481 41 |

Total........................................ $29,581 41

Afterwards, on the fourteenth of October, the judge
alone presiding, it was ordered by the court, "that the
clerk issue proper warrants on the treasurer of the county
for all claims that have been allowed, or that may here-
after be allowed, in the order in which they have been
allowed."

On the seventeenth of October, Roots, and others, citi-
zens of the county, and taxpayers, filed this bill in the
Pulaski chancery court against defendant Worthen, the
clerk; exhibiting the foregoing proceedings of the court,
and alleging: that. at different times, the court had made
large allowances, in favor of many individuals, too numer-
ous to be made parties, amounting in all to about $65,000;

upon which no warrants had, as yet, been drawn, and which remained unpaid. Of these, about $21,354 had been allowed prior to the eighteenth day of March, 1879.

The usual form in which those allowances had been made, prior to said date, is shown by an order exhibited for example, which merely states that "the same is allowed and audited as an established claim against Pulaski county."

The form, after said date, is shown in like manner, which is the same, followed by these words: "and the clerk is ordered to draw his warrant on the county treasurer, payable out of the appropriation to defray the legal expenses of the county."

The amount of allowances already made, at the time of filing the bill, even those made after said date, greatly exceeded the amount of said appropriations.

They complain that the indiscriminate issue of county warrants, authorized by the order of October 14, in disregard of the objects and amounts of said appropriations, would be illegal, and injurious to the public service, and detrimental to the taxpayers. They fear the clerk will proceed to issue them, and, as the circuit court was not then in session (nor would be for some time), they pray that the defendant be restrained from issuing any warrants, on any allowances made since the eighteenth of March, 1879, exceeding in the aggregate the amounts of the said several appropriations; and, also, from issuing any warrant on any of said funds, after said fund shall have been exhausted by prior warrants; prays, also, for general relief.

The defendant appeared, and, without answer, or formal demurrer, the cause was submitted on the seventeenth of October. On the thirty-first, the chancellor, by a final order restrained the defendant from drawing any warrant

on any fund, unless there should be a balance of said fund, duly appropriated by a proper court, consisting of a majority of the justices. Defendant appealed.

It would have been better to have required an issue of law or fact to be made before final hearing. The submission, however, may be taken as an admission by defendant of all the matters contained in the bill and exhibits. The order of the fourteenth of October is not, *upon its face*, illegal. It was in conformity with the usual and long established mode of administering the county revenues. The clerk was directed to issue *proper* warrants on the treasurer for all claims, etc. This was, so far, right, that it requires extrinsic evidence to support the claim of illegality, on the ground of excess of warrants over the appropriations. It is not clear that a writ of certiorari could have brought to the notice of the circuit court the point made by the bill, which is not the power of the county court to direct the clerk to issue warrants in the mode prescribed; but the power of the clerk, under such order, to issue them after the appropriations may be exhausted. The remedy, if the complainants have one, is not at law, plain, adequate and complete, and the chancellor properly exercised jurisdiction in the case.

The question is rather as to the scope and meaning of the order, than as to its validity. In a normal condition of county affairs, where there was no county debt, and where the appropriations met the county expenditures, the order would be a very proper one. But it is alleged that in Pulaski county such a healthful normal condition does not exist; that, in truth, the allowances greatly exceed the appropriations, and that the order, properly construed, does not authorize the clerk, as a ministerial officer, to continue the issue of such warrants as the order directs, *after* the

books of the office show that warrants, properly issued, have exhausted the appropriation. The proper construction of the order, and the powers conferred by it, are to be determined by the policy of our constitution and laws with regard to the county revenues and expenditures. If they contemplate the issue of warrants, and the use of them by citizens, in anticipation of appropriations to be made for the particular funds drawn upon, the threatened action of the clerk would be right. If they do not, the complainants have the right to require that he be restrained to the narrower construction of the order, and follow it only to the extent of the appropriations. In short, did the constitution and laws, on the fourteenth of October, 1879, require or empower the county court to issue warrants upon allowances, judicially made, irrespective of any consideration as to whether the proper appropriations for such warrants had been exhausted by previous warrants?

Let us look to the system as it existed up to the time of the constitution of 1874. The county revenue then consisted of divers *funds*, raised by taxation for special purposes. These were for county purposes generally; for public buildings; for support of the poor; for bridges; for roads; and for interest and principal on the public debt. The board of supervisors, answering to the old, and present county courts, determined *the amount* to be raised for each purpose, which was set forth specially on the record. The clerk was required carefully to ascertain the amounts collected for each purpose, and it was forbidden to use any specific fund for any other purpose than that for which it was levied, until the purposes of the special tax had been accomplished. *Gantt's Digest, sec. 5059.* It is to be observed that the amounts which might be levied for such purpose was limited to a definite maximum per centage, as was also

the school tax for each district. (*Ib.*, *5068*.) These funds were obviously appropriated as raised, as effectually as if they had been raised by a tax *in solido*, and then divided up and appropriated to the several objects.

With regard to allowances and warrants, it was provided that the board should "have and exercise" the power "to audit, settle and *direct the payment* of all just demands against the county" (*Gantt's Digest, sec. 595, sixth clause*); and it was made the duty of the clerk, whenever an order for an allowance might be entered upon the record, to issue in favor of the creditor, and upon his request, a warrant for the allowance, to be drawn upon the treasurer, and to be paid either out of the fund for county expenditures, or, as the case might be, out of any particular fund. (*Ib.*, *sec. 605.*) The clerk was required further to keep a register of all warrants issued, setting forth the numbers, date, name of the payee, the account upon which it was drawn and the amount. (*Ib.*, *sec. 607.*) We observe here provision for keeping the clerk thoroughly advised of the relation between the sums collected for the several funds, and the drafts made upon them; so that he might know when the funds were exhausted. Yet, nevertheless, it was made his imperative duty to continue their issue upon all allowances, whether the funds upon which the warrants were drawn might be exhausted or not.

When warrants, thus issued, were presented to the treasurer, it was his duty to pay them at once, having funds, or forfeit four-fold the amount to the holder. (*Ib.*, *sec. 1037.*) If he had no funds, he indorsed the fact upon the warrant, and it bore interest from that date at 6 per cent. (*Ib.*, *sec. 1039.*) When funds came in it was made the duty of the treasurer to give notice of his readiness to redeem, which stopped the interest, and they were redeemed and paid in

the order of their number and date. (*Ib., secs. 1041–1042.*) In doing this, the treasurer was required to keep a strict register of warrants, similar in all respects to that required by the clerk. (*Ib., sec. 1044.*) It is manifest that the object had in view in requiring these minute and strict accounts of the amounts drawn was *not* that the clerk should be advised when the specific fund was exhausted, in order that he might cease to draw further.

These warrants remaining unpaid, were not however dead, meanwhile, and useless in the hands of the citizen. Irrespective of number or date they were made receivable for " all taxes and debts accruing to the county." (*Ib., sec. 610.*)   There could have been but one policy in this— a wise and wholesome one.   It gave the warrants a value, independent of any specific fund on hand to pay them, and encouraged the citizen to render services to the county, which were indispensable to the maintenance of the government, and which, in many cases, could not be compelled, or if compelled, would produce hardship.   I have never heard that, under that system, any complaints were made of evils arising from the practice of issuing warrants upon all allowances.   Great evils arose from the corruption of county officers in some cases, and from the extravagance and improvidence of boards of supervisors, in others. Allowances were made without stint, and for shocking amounts, to cover depreciated scrip.   Extravagant contracts were made, and taxes levied, for public buildings, under *sec. 5060.*   By these malpractices, a great many of the counties became, and some still remain, hopelessly embarrassed with debt.   The warrants were the result, and not the cause, of the evils.   The load of debt and the embarrassment would have been quite the same upon the allow-

ances alone, without the warrants. Such was the condition of things when the constitution of 1874 was adopted.

By that constitution the board of supervisors was abolished, and the county affairs entrusted to the county court, consisting, ordinarily, of a single judge, and having " exclusive original jurisdiction in all matters relating to county taxes, roads, bridges, ferries, paupers, etc.; * * * the disbursement of money for county purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective counties." But, it was provided that the justices of the peace of each county should *sit with and assist* the county judge " in making appropriations for the expenses of the county, in the manner to be prescribed by law," or, in the absence of the county judge, should themselves, or a majority of them, constitute a court for the purpose. (See *Art. VII, sections 28, 30.*) Counties were prohibited from levying taxes exceeding one-half of one per cent. for all purposes, save for the payment of debts existing at the time of the adoption of the constitution, for which an additional half per cent. might be levied (*Art. XVI, section 9*); and it was provided (*sec. 10*) that " the taxes of counties, towns and cities shall only be payable in lawful currency of the United States, or the orders or warrants of said counties, towns and cities respectively." Counties were further prohibited (*Art. XVI, sec. 1*) from issuing any interest-bearing evidence of indebtedness.

By *sec. 1, of the Schedule to the Constitution*, all existing laws not in conflict, or inconsistent with this constitution, were continued in force.

The important change effected by these provisions, was to take the administration of county affairs out of the hands of boards of supervisors, too many of which—it is

now public history—had recklessly ruined their county finances; and commit so much of it as touched the revenue to a more conservative and reliable body, to be composed of the justices of the peace with the county judge.    These were simply to levy the taxes, and make appropriations for county expenses.    It was, in effect, the same duty which had been imposed upon the old supervisors, who had levied and raised specific funds by taxation—instead of raising a sum *in solido*, and apportioning it to the different funds by appropriation.    The effect was the same.    It was only a change of tribunal.    There was no longer any use in presenting warrants to the treasurer for the purpose of interest, but in other respects the laws, as to the issuance of warrants, remained unimpaired, and it was *expressly provided* that they should always be receivable for county taxes. No payment of the warrant could be made until there might be an appropriation to the fund, but it remained, nevertheless, the duty of the clerk to draw the warrant upon the proper fund, and that warrant was, for wise purposes of policy, protected in its value by the ægis of the constitution—making it receivable for taxes.    Certainly there is nothing in this constitution to forbid the clerk to issue the warrants threatened.

The first general assembly under the new constitution, by act of February 5, 1875 (*Pamphlet Acts, first session, p. 143*), prescribes the time in each county for the meeting of the full court of justices, and the mode of procuring their attendance ; and directed that, at the time of levying the taxes, they should make an appropriation to defray the county expenditures for one year; the amount to be specified in dollars and cents, and not to exceed three-fourths of the county taxes levied.    The same act defined the jurisdiction of the county court, expressing, amongst other things, that

it extended "to audit, settle and direct the payment of all demands against the county." Upon this point, the act was but a declaration of the existing law, under which the court was not confined, in *directing the payment*, to cases where there was sufficient money left in the particular fund to meet the warrant. If it had been the intention or wish of the legislature to restrict the issuance of warrants to the case of unexhausted funds, this would have been the place to declare it. Its failure to do so, is very significant that the legislature did not consider such warrants an evil, and contemplated the continuance of the practice under the former laws, as adopted and brought under the new constitution by the schedule.

The same general assembly, at its second session (*Pamphlet Acts, second session, p. 51.*), regulated and restricted the county court in the manner and extent of *making allowances;* amongst other things, providing by section 3, "That no county court, or agent of any county, shall hereafter *make any contract or allowance* in excess of the appropriation made for the current year, with a proviso that the clerks and sheriffs might proceed to discharge all legal duties necessary in the administration of public justice, etc, and that such expenses should be paid out of the next appropriation. By the same act, the county courts were enabled to appropriate the full amount of the taxes levied for any year. There is no express repeal of any former act, nor is this act inconsistent with the former act directing the clerk to issue warrants on the allowances when made. Evidently the evil sought to be corrected was the old extravagance and improvidence in making contracts, and carelessness in making allowances, which lay at the root of all the troubles. Obviously, too, the act does not affect the *jurisdiction* of the court over the

subject matter, but only makes that erroneous which before was not so.

In this connection it is important to notice an act of the fourteenth of December, 1875, declaring and enforcing the constitutional policy of making warrants receivable for taxes. It declares, amongst other things, that all county warrants and county scrip shall be receivable for any taxes for county purposes, except for interest on the public debt and for the sinking fund; and this without regard to the time or date of issuance of said warrants, except that new warrants or scrip shall not be receivable for old debts existing at the time of the adoption of the constitution. Stringent provisions are made to compel collectors and others to comply with the act. (See *Pamphlet Acts of 1875, second session, p. 151.*) Further, in passing, it is germain to the subject to notice the act of March 8, 1877 (*Pamphlet Acts, p. 42*), making jurors' certificates receivable for taxes, in all respects as county warrants, and directing that they shall all be within the limit of the appropriations, as specified in the above-mentioned act of December 7, 1875.

A review of all this legislation anterior and subsequent to the constitution of 1874, together with that constitution itself, reveals a settled policy, almost in terms enjoined by the constitution itself—and persisted in until December 7, 1875—of supporting the credit of the counties, and encouraging the citizens to render their services with alacrity by making claims against the county a set-off for taxes. This could best be effected by authorizing the court to audit the claims and issue warrants—could indeed be effected conveniently in no other way, inasmuch as the collector could not know what claims against the county were valid until allowed; nor could he know anything of

allowances without examination of the records. It is a very remarkable thing that the right to use county warrants in payment of taxes should be crystalized into a constitutional provision, and indicates a strong sense in the convention of the evil and danger to the very framework of our government (which is built upon counties) of allowing the county debts to become utterly valueless in the hands of the citizens—as well as the hardship to the citizen of compelling services, which would be, to all practical intents, gratuitous.

The third section of the act of December 17, 1875, made the first attempt at a deviation from this policy, in prohibiting any county court or county agent from making thereafter any contract *or allowance* in excess of the appropriation for the current year. So far as contracts are concerned, the law is in harmony with the intent of the constitution in providing that the appropriations should be made by a court of justices. One of the crying evils of the land had been extravagant jobbing contracts made by county courts, or authorized agents, by which insupportable loads of debt had been imposed, and in many cases still remain, pressing upon the people. To prohibit such was wise and proper. But the ordinary expenses of the county government—those essential to its maintenance and absolutely required by law—stand upon a different footing altogether. These things should be done, as imperatively as the others should be strictly left undone; and to place the latter class of expenses on the footing of contracts was, to say the least of it, a matter, under the constitution, of questionable power.

The law, it is true, recognizes the rights of clerks and sheriffs alone to receive compensation for some kinds of services, required by their duties, and directs that they

shall be paid out of the next appropriation. But even as to these favored officers, they were required to wait in patience for an uncertain event, and were meanwhile unable to make that practical use of their just claims which the constitution contemplated. The succeeding legislature made a partial attempt to supply the defects of the act by providing for jurors' certificates, and making them receivable for taxes as warrants would be.

Such being the condition of the law, the act of March 18, 1879, was passed, which we have now to construe. The first section repeals many of the foregoing acts, for the purpose, apparently, of clearing the way for a complete and well defined policy. Amongst the repealed acts is that part of the act of December 7, 1875, which limited the power of the court to make contracts or allowances beyond appropriations. The second section prescribes the time for the meeting of the full county court to levy the taxes and make the appropriations. The succeeding sections, to section 5, concern only the organization of the court.

The sixth section, which consists of many clauses, provides for reports on the affairs of the county, to be furnished, respectively, by the clerk, sheriff, treasurer and county judge, and for the reference of these reports, if desirable, to committees, after which the court is directed to make appropriations for the current year, in the following order:

1. To defray expenses of courts of record and magistrates' courts, designating the sum for each.

2. For expenses of prisoners in jail accused or convicted of crime.

3. For expenses of making assessment and tax books, and collecting taxes.

4. For expenses of public records of the county or district.

5. For expenses of paupers.

6. Expenses of building and repairing public roads and bridges, and taking care of public property; and—

7. For such other expenses of county government as are allowed by the laws of the state.

Then the tax shall be levied; and, by section 7, the court is required to specify in dollars and cents the amount of appropriation for each purpose, restricting the whole aggregate amount of the taxes levied for the year.

Section 8 requires the clerk to open an account with each appropriation, debiting it with the full amount, and crediting it from time to time with *allowances* made upon it by the court, when made. Then follows this provision of—

Sec. 9. "No county court or agent of any county shall hereafter make any *contract* on behalf of the county unless an appropriation has been previously made therefor, and is wholly or in part unexpended."

What is noteworthy in this section is, that it restores the policy of the act of December 7, 1875, as to *contracts*, but designedly omits any restrictions upon *allowances*. The nature and reason of this distinction, and, indeed, the full scope of the operation of the constitution itself, will become apparent from a consideration of the various purposes for which the tax is to be levied. Reverting to them, it will be seen that the first four are of an indispensable nature, essential to the support of the government. They are for services that *must* be performed, or the business of the counties must stop. The last three are not supposed to be imposed by necessity, but are matters of contract. It is well that appropriations be made for all purposes, but of great consequence that in the matter of *contracts* the expenses of the

counties should be limited to the amounts appropriated. This is impossible in cases of positive service required by law, and expenses incident to them; and in accordance with this view the legislature did not reimpose upon the county court any disability as to allowances. Indeed, it is plain that any other view of the case would place the county in the attitude of dealing oppressively and unjustly with those citizens who render her involuntary or indispensable services.

Section 10 provides that the warrants drawn by the clerk shall specify the *fund,* or appropriation, upon which the same are respectively drawn; and that "when so lawfully drawn and issued," said warrants shall be receivable for all taxes lawfully levied by the county court, or for licenses, or debts due the county. There is an express proviso in the next section, with regard to receiving those warrants for taxes; that the provisions and intent of the act of fourteenth December, 1875, shall be observed, which, it will be remembered, made them receivable without regard to date for all county taxes, except for interest or sinking fund.

The twelfth section requires that every allowance made shall set forth the appropriation out of which the same is to be paid. It had always been the practice in the state to issue warrants upon funds exhausted, as if they were in the treasury, although the particular fund was required to be specified. In the administration of the state revenue it is not done; but that results from an express statutory provision. There is nothing in the twelfth section to restrain the court from making allowances upon exhausted funds, in the face of the marked removal of that restraint in another section.

The irresistible conclusion, upon a review of all the legis-

lation, is, that the act of March 18, 1879, is the result of an effort (perhaps imperfectly accomplished) to return to the true policy indicated by the constitution of 1874:   To require all appropriations to be made and taxes to be levied by a full court of justices, and that no money should be paid out of the treasury except on appropriation; and to restrain the county court, or its agents, from making any contracts until money may be appropriated to meet them.   This gives effect to the policy of requiring the justices, as a conservative body, to act with the judge.

Hand in hand with this, is another policy, quite as plainly indicated in the constitution.   It is, that every citizen, having an ascertained debt against the county (or a warrant as it is termed), shall have the privilege of paying it in for taxes.   No discriminations are made in favor of any persons who, standing on the same rights, may have been more industrious or fortunate than others, in obtaining these evidences of their claims.   It would be, as to these creditors, the same, in effect, to refuse to allow their claims, and deny them warrants, as it would be to refuse to receive their warrants, when issued, and either would be repugnant, not only to the spirit of the constitution, but to that of all our legislation for a series of years.

We search in vain for any prohibition, in the act of 1879, against allowing claims by the county court beyond the appropriations.   A large class of the claims *ought* to be allowed, and with regard to those depending on *contracts made* in excess of appropriations, if it be error to allow them, any citizen may appeal and correct the error.   There is room for the operation of the whole constitution in all its aspects.

The law makes it the duty of the clerk to issue warrants

on allowances when made, and we think the chancellor in error in making the injunction perpetual.

Let the decree be reversed, the injunction dissolved, and the bill dismissed.

ENGLISH, C. J., *dissenting.* With all due respect for the judgment of my brother judges, I dissent from so much of their opinion in this case as holds that the clerk may issue warrants upon allowances not covered by appropriations, or against exhausted appropriations. I think this is prohibited by the spirit and intention of the act of March 18, 1879, as indicated in several of its provisions, though not directly expressed.